

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-22-00359-CV

**IN THE INTEREST OF J.E.J.A.**, a Child

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-00362
Honorable Monique Diaz, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: December 7, 2022

AFFIRMED

This is an accelerated appeal from an order terminating appellant A.A.'s parental rights to her son, J.E.J.A.[1] A.A. argues the evidence is legally and factually insufficient to support the trial court's best interest finding. We affirm the trial court's order.

### BACKGROUND

In February 2021, the Texas Department of Family and Protective Services received a referral from San Antonio Behavioral Health stating A.A.'s teenage daughter was harming herself and expressing suicidal ideations. During its investigation, the Department discovered J.E.J.A., who was eleven years old at the time, had not attended school since December 2020. The

---

[1] To protect the identity of the minor child in this appeal, we refer to the parent and child by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

Department also learned J.E.J.A. had high functioning autism, disruptive mood dysregulation disorder, ADHD, and anxiety, and A.A. was not consistently giving him his medication. On March 1, 2021, the Department visited A.A.'s home and found police had arrested A.A. for possession of a controlled substance, specifically methamphetamines. The Department initiated emergency removal proceedings by filing a petition seeking temporary managing conservatorship of J.E.J.A. and termination of A.A.'s parental rights.[2]

The trial court signed an emergency removal order, named the Department temporary managing conservator, and granted A.A. temporary possessory conservatorship. The Department also placed J.E.J.A. with a foster family. Following the adversarial hearing, the trial court ordered A.A. to comply with all the provisions of the Department's service plan, which required her to attend counseling sessions, complete parenting and domestic violence classes, complete a drug and alcohol dependency assessment, submit to random drug testing, provide a safe and drug-free home for J.E.J.A., and maintain stable employment. The trial court's order further provided A.A.'s failure to comply with any of these requirements could result in termination of her parental rights.

A.A. started participating in Bexar County's Family Drug Court program, and in August 2021, the Department returned J.E.J.A to her care. A.A. successfully completed the program by October 2021 but relapsed two months later, and the Department placed J.E.J.A. with another foster family in Richmond, Texas. In April 2022, the Department placed J.E.J.A. with his half-sister and her biological father. On May 16, 2022, the case proceeded to trial, and the trial court heard testimony from the Department caseworker, J.E.J.A.'s foster father, and A.A. The trial court found by clear and convincing evidence A.A. knowingly placed or allowed J.E.J.A. to remain in conditions endangering his well-being; engaged in conduct or knowingly placed J.E.J.A. with

---

[2] The Department also sought termination of J.E.J.A.'s father's parental rights, which the trial court ultimately granted. J.E.J.A.'s father did not appeal the termination order, and therefore, he is not a party to this appeal.

persons who engaged in conduct endangering his well-being; failed to comply with specific provisions of a court order; and used a controlled substance and continued to abuse the substance after completing a substance abuse treatment program. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), and (P). The trial court also found termination of A.A.'s parental rights was in J.E.J.A.'s best interest. *See id*. § 161.001(b)(2). A.A. now appeals and challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding.

## BEST INTEREST

### *Standard of Review*

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and termination is in a child's best interest. *See id*. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. We employ this heightened standard to guard the constitutional interests termination implicates and judge whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.).

We review the legal and factual sufficiency of the evidence under the well-established standards of review set by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). In reviewing the legal sufficiency of the evidence, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id*. at 266. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we do not disregard undisputed evidence even if it does not support the trial court's finding. *Id*. In reviewing the

factual sufficiency of the evidence, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

### *Applicable Law*

In a termination proceeding, the Department bears the burden to establish termination is in the child's best interest. *Id*. In conducting a best interest analysis, we apply the non-exhaustive *Holley* factors, which include the following: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove every factor for a trial court to find termination is in the child's best interest, and no single factor is necessarily dispositive. *Id.* at 372; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We also remain mindful keeping the child with a parent is presumably in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, promptly and permanently placing a child in a safe environment is also presumed in the child's best interest. TEX. FAM. CODE § 263.307(a). Therefore, we consider the factors listed in section 263.307 of the

Texas Family Code to determine whether a parent can provide the child with a safe environment.[3] *See id.*

Finally, we consider direct and circumstantial evidence, subjective factors, and the totality of the evidence in our best interest analysis. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, evidence proving any of the statutory grounds for termination is probative on the issue of best interest. *C.H.*, 89 S.W.3d at 28. "A trier of fact may measure a parent's future conduct by [her] past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *E.D.*, 419 S.W.3d at 620. Past conduct can include drug use, which can destabilize the home and expose children to physical and emotional harm if not resolved. *See, e.g., In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *8 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). We also focus on whether termination is in the child's best interest, not the parent's best interest. *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.).

### *Application*

#### 1. A.A.'s Drug Use

The Department produced evidence A.A. grappled with a methamphetamine addiction, and her addiction impacted her ability to care for J.E.J.A. This court has recognized "[p]arental drug

---

[3] These factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the Department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307.

abuse reflects poor judgment and may be a factor to consider in determining a child's best interest." *In re A.L.H.*, No. 04-20-00452-CV, 2021 WL 1110612, at *6 (Tex. App.—San Antonio Mar. 24, 2021, pet. denied) (mem. op.) (quoting *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied)) (internal quotation marks omitted); *see also* TEX. FAM. CODE § 263.307(b)(8) (stating courts may consider history of substance abuse by child's family). This is because "a parent's illegal drug use exposes [a] child to the possibility that the parent may be impaired or imprisoned." *In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) (citing *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.)). When a parent decides to continue "to engage in illegal drug use during the pendency of a termination suit[,]" this decision "may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *Id.* (quoting *In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *5 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.)) (internal quotation marks omitted).

In this case, the Department caseworker testified when the Department initiated its investigation and visited A.A.'s home, it learned A.A. had been arrested for possession of a controlled substance, specifically methamphetamines. A.A. also admitted to the trial court she was not home when the Department visited because she had been arrested and charged with possession. When asked about the status of her possession case, A.A. testified she agreed to participate in a pretrial diversion program. The Department caseworker confirmed A.A.'s enrollment in Bexar County's Drug Court program, and she testified A.A. maintained good standing in the program by attending her classes and taking random drug tests. Due to her good standing, the Department returned J.E.J.A. to her care in August of 2021, and she successfully completed the program on October 14, 2021.

However, in December 2021, A.A. stopped cooperating with the Department and complying with her service plan by refusing to take any drug tests. The Department caseworker testified A.A. took her last test on December 30, 2021, and A.A. admitted to her she relapsed with methamphetamines on December 15, 2021. She testified the last drug test A.A. took was on December 30, 2021. Both the Department caseworker and A.A. testified in January 2022, A.A. contacted the Department and admitted she was unable to continue caring for J.E.J.A. due to her substance abuse. The Department caseworker further testified A.A. was supposed to complete an outpatient treatment program, but by March 2022, she stopped cooperating and was discharged from the program. The Department caseworker explained she attempted to work with A.A. regarding her substance abuse, but A.A. continued to use illegal drugs and admitted to her she had relapsed with heroin and cocaine in March 2022. A.A., however, disputes the caseworker's testimony and testified she had relapsed with only methamphetamines in December 2021 and March 2022. She also testified she used marijuana during the case.

The Department caseworker testified she was concerned to reunite J.E.J.A. with A.A. due to her repeated relapses. She testified after the Department removed J.E.J.A. from A.A.'s care in January 2022, she provided A.A. with resource guides for assistance, took A.A. to a medical appointment when A.A. was not feeling well, and tried to get A.A. into another treatment program. She testified she emphasized to A.A. the importance of reengaging in a treatment program, and she described how one of the treatment programs made multiple attempts to contact A.A., but A.A. never returned any calls. The caseworker further testified A.A. lived at a sober living facility for about a week but ultimately left. A.A. explained she had to leave because she was being evicted from her home, so she had to pack her belongings.

**1. A.A.'s Compliance with Court-Ordered Services**

The Department also produced evidence A.A. did not complete the requirements outlined in her court-ordered service plan. "A parent's performance under a service plan is also relevant to several of the *Holley* factors, including the emotional and physical danger to the child now and in the future, parental abilities, and stability." *In re M.L.C.*, No. 04-17-00459, 2017 WL 6597828, at *6 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.); *see Holley*, 544 S.W.2d at 371–72. "It is also relevant to many of the factors set out in section 263.307(b): (1) the willingness of the parent to seek out, accept, and complete counseling services, (2) the willingness and ability of the parent to effect[] positive changes within a reasonable time, and (3) whether the parent demonstrates adequate parenting skills." *M.L.C.*, 2017 WL 6597828, at *6; *see* TEX. FAM. CODE § 263.307(b)(10)-(11), (12).

Here, when asked whether A.A. completed her service plan, the Department caseworker testified many of the requirements were outstanding, including providing J.E.J.A. with a stable home and financial support, submitting to random drug testing, completing an inpatient substance abuse treatment program, and reengaging in counseling. The caseworker testified A.A. did not have a stable home. During the case, she had been living in a home owned by an elderly woman, and she was evicted when the elderly woman passed away. The Department caseworker testified A.A. had been living at the home rent-free for the past year. A.A. testified she had thirty days to pack her belongings, but the son who inherited the property ultimately threw out her belongings. She testified she had nowhere to store her belongings and started living in her car. Unable to find housing, she ultimately moved to California and was currently staying in an Airbnb. The Department caseworker testified she had not known A.A. moved to California until the morning of trial.

As to employment, the Department caseworker testified A.A. did not provide proof of any employment. A.A. testified she had been working at Boost Mobile, but she lost her job in February 2022 because the Department asked her to work less so she could spend more time with J.E.J.A. A.A. explained as a result, she did not qualify for any bonuses, and she ultimately had to quit. A.A. added, however, she was now working in California cleaning offices. The Department caseworker confirmed A.A. had told her the morning of trial about her new job, but she could not verify either her housing or employment at that time. This evidence not only shows A.A.'s inability to complete her service plan but also shows her lack of stability, which supports a trial court's best interest finding. *See M.L.C.*, 2017 WL 6597828, at *6 ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs.").

## 2. A.A.'s Parenting Abilities and J.E.J.A.'s Needs

The trial court heard evidence regarding A.A.'s parenting abilities and J.E.J.A.'s special medical needs. "The factfinder may consider a parent's parenting skills in a best interest analysis." *In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). When reviewing a parent's parenting abilities, "a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children." *In re J.F.-G.*, 612 S.W.3d 373, 388 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021). Additionally, "[e]vidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *Id.* (quoting *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied)) (internal quotation marks omitted).

According to the Department caseworker, when the Department became involved with the family, J.E.J.A. had not attended school for three months. When asked about J.E.J.A.'s school absence, A.A. testified she did not recall it being "that long" and thought it was only for a month.

The caseworker testified J.E.J.A. was currently attending school and had a strong bond with his teacher. The caseworker emphasized J.E.J.A. needed structure because throughout his young life, he did not have consistency due to A.A.'s substance abuse. However, the caseworker acknowledged when A.A. was participating in the drug court program, she exhibited adequate parenting skills and was reunited with J.E.J.A. for a short period of time due to her progress.

The record also shows J.E.J.A. has special medical needs. The Department caseworker explained J.E.J.A. had been diagnosed with high functioning autism, disruptive mood dysregulation disorder, ADHD, and anxiety. The record reflects when the Department became involved with the family, A.A. admitted she did not consistently give J.E.J.A. his required medication. The Department caseworker also testified J.E.J.A. struggled with his behavior, and on more than one occasion, he had to enter an inpatient mental health treatment center. She testified A.A. had to take J.E.J.A. to the treatment center when he had been returned to her care, and on another occasion, his current foster family had to take him to the treatment center because he had become very aggressive and threatened them with a knife. According to the caseworker, J.E.J.A.'s aggressive outburst happened after one of his visits with A.A. The foster family fully cooperated with the behavioral health clinic, and at this time, they are currently ensuring J.E.J.A. regularly sees his mental health treatment providers. Considering J.E.J.A.'s special medical needs, the caseworker concluded she believed A.A. could not provide for his well-being due to her substance abuse and lack of stability.

### 3. J.E.J.A.'s Desires and the Department's Permanency Plan

At the time of trial, J.E.J.A. was eleven years old and living with his biological sister and her father. The foster father testified J.E.J.A. was doing well, and he described J.E.J.A. as "an amazing young man." He testified J.E.J.A. had an "amazing spirit" and "want[ed] to do good things." He also told the trial court he was working with the Department to permanently adopt

him. He further testified he recognized J.E.J.A. struggled with his behavior and was currently seeing what "he [could] get away with." He explained he was doing his best as a parent to discipline him by teaching J.E.J.A. about consequences. He described one incident involving spanking and explained he left J.E.J.A. alone for eight to ten minutes after he spanked him and then explained to him why he had been spanked. He testified J.E.J.A. usually acts out after visits with A.A. or the Department caseworker, and in that specific instance, he had recently seen A.A. He further testified after the incident, he began working with the Department to find other ways to discipline J.E.J.A. that did not involve spanking.

The trial court also heard evidence J.E.J.A. no longer wanted to see A.A. Both the Department caseworker and foster father testified J.E.J.A. told them he did not want to see or live with his mother. Specifically, the foster father testified J.E.J.A. told him he did not think he was safe with his mother and his mother abused him. J.E.J.A. also told him he was worried the Department would remove him from the foster home, and he believed no one loved him or wanted to take care of him. The foster father testified he wished to adopt J.E.J.A., and he would comply with all of the Department's policies to ensure J.E.J.A. remained with him. He testified he was receptive to going to therapy, working with J.E.J.A.'s teachers, and working with the Department regarding how to parent J.E.J.A. The Department caseworker echoed the foster father's testimony and testified termination of A.A.'s parental rights was in J.E.J.A.'s best interest.

### 4. Summation

After reviewing the evidence and considering the *Holley* factors and the statutory factors in section 263.307(b) of the Code, we conclude the trial court could have reasonably formed a firm belief or conviction termination of A.A.'s parental rights was in J.E.J.A.'s best interest. *See J.F.C.*, 96 S.W.3d at 266. The evidence shows A.A. continued to abuse illegal drugs throughout the case, did not secure stable housing or employment, and J.E.J.A. remained in a safe and stable

environment with his current foster family, who planned to work with the Department and ultimately adopt him.

A.A. does not dispute this evidence, but rather contends her drug use and lack of stable housing "become less relevant if the Department is named sole managing conservator," and the Department failed to meet its burden of demonstrating termination was in J.E.J.A.'s best interest. For support, she cites a case where despite evidence of a parent's illicit drug use, the Third Court of Appeals reversed the trial court's termination order and did not disturb the appointment of the Department as permanent managing conservator. *See C. C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204 (Tex. App.—Austin 2022, no pet.). There, however, the Third Court noted other factors supported its reversal by specifically pointing to evidence showing the parent demonstrated a comprehensive understanding of her child's particular needs, the child had a strong bond with the parent, and the Department did not have a permanent placement for the child. *See id*. at 220–22. The Third Court concluded when considering this evidence, the parent's drug use became less relevant and preservation of the parent-child relationship was in the child's best interest. *See id.* at 222. It then held the evidence was factually insufficient to support the trial court's best interest finding. *Id.*

Here, the evidence shows the Department had a permanent placement plan for J.E.J.A., and J.E.J.A. desired to remain with his foster family, who met all J.E.J.A.'s special medical needs. The evidence also showed even though A.A. exhibited adequate parenting skills when she was participating in the drug court program, her past conduct revealed she did not keep J.E.J.A. in school and failed to consistently give J.E.J.A. his required medications. Accordingly, the trial court was free to measure her future conduct by her past conduct when making its best interest determination, and it could reasonably conclude J.E.J.A. would be subjected to a life of instability and uncertainty. *See E.D*., 419 S.W.3d at 620. Moreover, A.A. has not challenged the trial court's

findings under section 161.001(b)(1), and these grounds for termination are probative on the issue of best interest. *See C.H.*, 89 S.W.3d at 28.

Accordingly, after considering all the evidence in the light most favorable to the best interest finding, we conclude it was reasonable for the trial court to have formed a firm belief or conviction termination of A.A.'s parental rights was in J.E.J.A.'s best interest. *See J.F.C.*, 96 S.W.3d at 266. We further conclude any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best interest finding or was not so significant the trial court could not have reasonably formed a firm belief or conviction termination was in J.E.J.A.'s best interest. *See id*. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best interest finding, and we overrule A.A.'s sole issue.

## CONCLUSION

We affirm the trial court's order terminating A.A.'s parental rights to J.E.J.A.

Luz Elena D. Chapa, Justice